ALEX JOHNSON v. DULUTH, WINNIPEG & PACIFIC RAILWAY COMPANY AND OTHERS.[1]

May 12, 1922.

No. 22,693.

**Definition of wanton act resulting in injury to person.**

1. In a personal injury action, to constitute wanton conduct the person committing the act must be conscious, from his knowledge of existing conditions, that his mode of action would naturally or probably result in injury. Without knowledge of the presence of someone liable to be injured, he could not have expected that his act would result in injury.

**Ignorance of boy's presence on locomotive foot board.**

2. Proofs as shown by the record considered and *held* that it does not appear therefrom that the defendant charged with wanton conduct knew of the presence of the boy at the time and that the order for judgment notwithstanding the verdict was justified.

Action in the district court for St. Louis county to recover $20,000 for personal injuries. The answer alleged that the injuries were caused by the negligence of plaintiff's minor son who was a trespasser. The case was tried before Fesler, J., who at the close of the testimony denied separate motions on the part of defendants for directed verdicts, and a jury which returned a verdict for $6,000. Defendants' motion for judgment notwithstanding the verdict was granted. From the judgment in favor of defendants, plaintiff appealed. Affirmed.

*John Jenswold* and *John D. Jenswold*, for appellant.

*Washburn, Bailey & Mitchell*, for respondents.

[1]Reported in 188 N. W. 221.

QUINN, J.

Action to recover for personal injury to plaintiff's minor son, occasioned by the alleged wanton conduct of the defendant, Benedict J. Yenne, while acting as a fireman on one of the defendant company's locomotives. There was a verdict of $6,000 in favor of the plaintiff. Upon their motion the trial court ordered judgment for the defendants notwithstanding the verdict. From a judgment entered in accordance therewith the plaintiff appeals.

At the time and place of the injury, there were two parallel railway tracks extending east and west, crossed at right angles by a public street. The locomotive, in connection with which the injury occurred, was upon the north track headed to the east. It was being used in switching and spotting cars. The plaintiff's son, Clarence, who was 15 years of age, was playing top with several younger boys at the northwest corner of the intersection. The locomotive backed up to the west side of the crossing and stopped. Clarence got onto the north end of the foot board at the front end of the locomotive, on the fireman's side, and Leonard Nelson got onto the opposite end. Clarence stood facing the locomotive with his elbows resting on the hand rail, in the act of whittling a groove in his top. The locomotive, with the boys on the foot board, backed to the west some considerable distance and spotted some cars on a side track, then pulled ahead to within about 150 or 200 feet of the crossing, at which time and place the boy received the injury complained of.

The fireman saw the boys playing top as he passed, but he says he did not know any of them. He denies that he saw or knew that either of them got onto or was upon the foot board. Clarence testified that he stood on the board about over the rail of the track; that he tried to keep out of sight of the trainmen; that, as the locomotive started east after spotting the cars on the side track, he peeked to see if any one was looking; that he then stepped in toward the coupling; that when they had gone but a short distance he felt some hot water strike him; that it came from the hose in the front window of the cab; that he then stepped over a little farther toward the coupling; that he stood for a moment and then decided to get off,

so he jumped ahead of the locomotive, but stumbled and fell, and that the locomotive and four cars passed over him, severing his leg below the knee.

Viewing the case from the proofs most favorable to the plaintiff, it may be said that there was testimony to warrant a finding that water from a hose in the hands of the fireman struck the boy. We have examined the record with care and have failed to discover any testimony tending to show that the fireman either saw the boy or knew of his presence upon the foot board until after the injury. We know of no rule of evidence which affords any presumption, in the absence of proof, that any man in the position of fireman on a locomotive, would turn a hot water hose upon a boy standing upon a foot board on the front of a moving locomotive. Such an act would scarcely result in anything less than severe injury to the lad and would be fiendish in the extreme. It may be said to the credit of the boy that, terrible as the injury was, his testimony was candid. When asked whether there was anything to indicate that the fireman saw him, his answer was: "He must have seen me when he threw the hot water at me." This answer was but an assumption, not sufficient to make a question for the jury as to whether the fireman knew of the boy's presence on the foot board. It was but a mere conjecture.

To constitute wanton conduct, as the term is used in this case, the party committing the act must be conscious, from his knowledge of existing conditions, that his mode of action would naturally or probably result in injury. Without knowledge of the presence of some one upon the foot board, he could not have expected that his conduct would result in injury, even though he intended to throw water over the front end of the locomotive, of which there is no evidence. The boys all testified that when Clarence went under the locomotive the fireman was sitting in his seat at the side window. When the alarm was given the locomotive was stopped immediately, the fireman got out, began to search for the injured person and found him under the fourth car. He took him in his arms and carried him to the locomotive. There was no water on Clarence when he was picked up nor any indication of his having been wet.

The locomotive was of the large standard type. A person standing on the foot board immediately over the rail could not see the front cab window, nor could a person in the cab see another on the foot board, unless he was standing on the outer end thereof. When the hose is used to wash down the cab, more or less water splashes against the fire box, thereby filling the cab with steam which escapes through the open windows. It is not clear that the hose would throw water from the cab over the front of the boiler, but it is not unreasonable to say that it might throw it out onto the boiler so that it would splash over the front and to where the boys stood.

The testimony of the other boys was to the effect that they saw water and steam coming from the cab windows. Some of them thought they saw the end of the hose. The trial court viewed the locomotive, saw and heard the witnesses and after due consideration came to the conclusion that the evidence did not support the finding of the jury that the fireman knew of the presence of the boys upon the foot board and ordered judgment accordingly. In this we think the court was right.

Judgment affirmed.