SHELBY CHARTER TOWNSHIP v STATE BOUNDARY
COMMISSION

Docket Nos. 72897, 73333. Argued November 12, 1985 (Calendar No.
4). Decided May 20, 1986. Rehearing denied *post*, 1203.

Shelby Charter Township petitioned the Macomb Circuit Court,
seeking to set aside a decision by the State Boundary Commis-
sion permitting the City of Utica to annex a portion of the
township's territory on the ground that, as a charter township,
it was exempt from annexation. The commission had held that
the township was not exempt because the amount of water and
sewer services provided by the township was insufficient to
meet the standard for exemption set forth in the charter
township act. The court, Lawrence P. Zatkoff, J., reversed,
holding that the standard in question unambiguously required
no more than the provision of any water or sewer service and
was not subject to interpretation by the commission, and that
the commission had acted in excess of its authority. The Court
of Appeals, BRONSON, P.J., and T. M. BURNS and KALLMAN, JJ.,
affirmed (Docket Nos. 66821, 67104). The commission appeals.

In an opinion by Justice BOYLE, joined by Chief Justice
WILLIAMS and Justices BRICKLEY and CAVANAGH, the Supreme
Court *held:*

The standard provided in the charter township act, that to be
exempt from annexation a charter township must, inter alia,
provide sewer or water services to its residents, imposes more
than a pro forma, de minimus requirement. Interpretation of
the act to require no more than provision of any water or sewer
services was error. The commission did not exceed its authority
by not applying that interpretation; this requires reversal of
the decisions of the Court of Appeals and the trial court and
remand for further proceedings.

1. The charter township act provides that a charter township

REFERENCES

Am Jur 2d, Municipal Corporations, Counties, and Other Political
Subdivisions §§ 226, 228, 560, 569-574.

Am Jur 2d, Water Works and Water Companies §§ 3-12.

See the annotations in the ALR3d/4th Quick Index under Public
Utilities.

that complies with certain enumerated standards is exempt from annexation to a contiguous city or village. Amongst the standards is the requirement that the township "provide[ ] water or sewer services, or both, by contract or otherwise." The language is not unambiguous and is susceptible to more than one meaning, and, thus, must be interpreted.

2. Interpretation of the standard as requiring only de minimus or pro forma water or sewer services as a prerequisite for exemption is inconsistent with the substantive nature of the remaining enumerated standards. In addition, the legislative history of the exemption section of the act indicates that the enumerated standards were intended to impose substantive, rather than de minimus, pro forma requirements. Thus, the commission did not exceed its authority by not applying the "any water or sewer services" interpretation of the exemption standard, and the judgments of the trial court and the Court of Appeals must be reversed.

Reversed and remanded.

Justice LEVIN, joined by Justice RILEY, dissenting, stated that provision by Shelby Township of water service to more than thirty percent of its residents was clearly more than de minimus or pro forma and constituted providing water service within the meaning of the 1978 amendments of the charter township act. The State Boundary Commission should be precluded from annexing to the City of Utica any property in Shelby Township because Shelby Township is a charter township that provides water or sewer services, or both, and thus is exempt from annexation.

Justice ARCHER took no part in the decision of this case.

129 Mich App 650; 341 NW2d 855 (1983) reversed.

### OPINION OF THE COURT

1. TOWNSHIPS — ANNEXATION — EXEMPTION — WATER AND SEWERAGE.

The standard provided in the charter township act that to be exempt from annexation a charter township must, inter alia, provide sewer or water services to its residents imposes more than a pro forma, de minimus requirement (MCL 42.34[1][f]; MSA 5.46[34][1][f]).

### DISSENTING OPINION BY LEVIN, J.

2. TOWNSHIPS — ANNEXATION — EXEMPTION — WATER AND SEWERAGE.

*A township which provided water service to more than thirty percent of its residents provided water service within the*

*meaning of the charter township act and thus should have been exempt from annexation (MCL 42.34[1][f]; MSA 5.46[34][1][f]).*

*Richard C. Johnston* for the petitioner.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Milton I. Firestone* and *Roderick T. MacGillis,* Assistant Attorneys General, for the respondents.

*William J. McGrail, Jr.,* for intervening respondent City of Utica.

BOYLE, J. The question before this Court is whether the State Boundary Commission exceeded its statutory authority when it determined that appellee, the Charter Township of Shelby, was not exempt from annexation under MCL 42.34(1); MSA 5.46(34)(1). The commission found that Shelby was not exempt on the basis that neither the amount of water services nor the amount of sewer services Shelby provided met the standard for exemption set forth in § 34(1)(f). Shelby appealed the commission's order of annexation to the Macomb Circuit Court, which set the order aside as in excess of the commission's statutory authority pursuant to § 106(1)(b) of the Administrative Procedures Act, MCL 24.306(1)(b); MSA 3.560(206)(1)(b).[1] The court held that MCL 42.34(1)(f); MSA 5.46(34)(1)(f) plainly and unambig-

---

[1] MCL 24.306(1)(b); MSA 3.560(206)(1)(b) provides:

Except when a statute or the constitution provides for a different scope of review, the court shall hold unlawful and set aside a decision or order of an agency if substantial rights of the petitioner have been prejudiced because the decision or order is any of the following:

\* \* \*

(b) In excess of the statutory authority or jurisdiction of the agency.

uously exempts a charter township which provides any water or sewer services from annexation, and that the commission had therefore exceeded its statutory authority in finding the amount of water and sewer services provided by Shelby to be insufficient for exemption from annexation. The Court of Appeals, with some qualification, affirmed, 129 Mich App 650; 341 NW2d 855 (1983). We granted leave to appeal, 422 Mich 857 (1985), and now reverse.

### FACTS

On December 14, 1977, the City of Utica filed a petition with the State Boundary Commission to annex one-half square mile of Shelby territory. MCL 117.9; MSA 5.2088. While the petition was pending before the commission, 1978 PA 242 and 1978 PA 591, amending MCL 42.34; MSA 5.46(34), were enacted, and Shelby began the process of incorporation, becoming a charter township on November 30, 1978. As amended by 1978 PA 591, § 34(1) provided:

Sec. 34. (1) A charter township existing on June 15, 1978, or a township incorporated after June 15, 1978 as a charter township that complies with the following standards, is exempt from annexation to any contiguous city or village except as provided in subsections (2) to (8):

(a) Has a state equalized valuation of not less than $25,000,000.00.

(b) Has a minimum population density of 150 persons per square mile to be determined by the secretary of state by dividing the most recent regular or special census of population by the number of square miles then under the jurisdiction of the charter township not to include the population or territory within the jurisdiction of an incorporated village.

(c) Provides fire protection service by contract or otherwise.

(d) Is governed by a comprehensive zoning ordinance or master plan.

(e) Provides solid waste disposal services to township residents, within or without the township, by contract, license, or municipal ownership.

(f) Provides water or sewer services, or both, by contract or otherwise.

(g) Provides police protection through contract with the sheriff in addition to normal sheriff patrol or through its own police department.

Nevertheless, at an adjudicative meeting held May 2, 1979, the commission held that Shelby was not exempt from annexation because it did not meet the standards of § 34(1)(f).

The evidence presented to the commission pursuant to Utica's 1977 petition indicates that Shelby's population consisted of approximately 40,000 residents in approximately 11,000 households, and that Shelby's land area consisted of approximately 35.6 square miles. According to the commission's undisputed findings with respect to the standards set forth in MCL 42.34(1); MSA 5.46(34)(1), Shelby (a) had a 1977 state equalized valuation of $262,736,360, (b) had a population density of approximately 1000 people per square mile, (c) had a full-time, forty-member fire department, (d) had a comprehensive zoning ordinance and master plan, (e) provided solid waste disposal services, and (g) had a full-time, forty-nine-member police department. In these respects the commission found that Shelby met the statutory standards for exemption from annexation. According to the evidence before the commission, however, Shelby provided sewer services to only 1200 residents in 500 homes on six percent of the township's territory, and provided water services to less than one-third of the popula-

tion, that is, to 12,000 residents in 4000 homes.[2] The commission found that neither the amount of sewer services, nor the amount of water services, provided by Shelby met the standard set forth in § 34(1)(f), "[p]rovides water or sewer services, or both, by contract or otherwise." The commission consequently held that Shelby was not exempt from annexation under § 34(1).

After further proceedings not relevant here, the commission granted Utica's petition at the May, 1979, adjudicative meeting. On December 11, 1980, the commission entered its final order of annexation. After initially staying the order, the Macomb Circuit Court reversed. The circuit court held that § 34(1)(f) unambiguously requires no more than the provision of any water or sewer service and was therefore not subject to interpretation by the commission. Since Shelby provided some water and sewer services, the circuit court held that "the State Boundary Commission decision is in direct violation of MCL 42.34 and . . . is in excess of the statutory authority and jurisdic-

---

[2] There is substantial confusion in the record about the amount of water and sewer services provided by Shelby. The SBC's final findings of fact and order stated:

> Shelby Township presently provides sewer service to approximately 6% of the township land area that contains 11,600 residents which is less than ⅓ of the township's current estimated population of 38,000.

* * *

> Shelby Township does not meet the standard of subsection (1)(F) of P.A. 591 of 1978, as it serves only about 6% of the township land area and less than ⅓ of the townships [sic] total population with sewer.

However, the parties agree that Shelby in fact provided 6% of its land area with sewer services, and 11,600 residents with water services. The evidence before the SBC so indicated, Response of Shelby Township to Questionnaire, and the comments of the commissioners at the May 2, 1979 adjudicative meeting indicate that the final SBC order's reference to "sewer service" was a typographical error which contradicted the SBC's actual findings.

tion of the agency." The Court of Appeals affirmed with the qualification that "[a] township that only provided token services would not be exempt under this statute since courts will depart from a literal construction of a statute when such a construction would produce absurd and unjust results." 129 Mich App 656.

### BACKGROUND

The boundaries of a unit of local government affect the tax base of the unit, the tax rate of its residents, the level of services provided to residents, and the potential for further development of the unit. Issues regarding annexations of part of a local unit to another therefore tend to be politically volatile. In accordance with long-established law in this state,[3] and with federal constitutional law,[4] this Court has recently held:

[3] The fixing of municipal boundaries is generally considered to be a legislative function. *Village of Kingsford v Cudlip,* 258 Mich 144 [241 NW 893 (1932)]; 37 Am Jur [Municipal Corporations, §§ 16, 23, 28, 29,] pp 633, 639, 645, 646 [56 Am Jur 2d, Municipal Corporations, Counties, and Other Political Subdivisions, §§ 41-43, 55, 57-62, 65, 68, 70]. In this State the power vested in the legislature to provide for incorporation of cities and villages is in no way limited by Constitution (art 8, §§ 20, 21) (home rule amendment), and the power conferred on the legislature by the Constitution (art 8, § 20) to provide by general law for incorporation of cities and villages includes change of boundaries when needed. *Village of Kingsford v Cudlip, supra.* In the absence of constitutional inhibition the legislature may submit the determination of boundaries to courts, or to municipal authorities, or to the qualified electors. [*Prosecuting Attorney v Rogers Twp,* 313 Mich 1, 9-10; 20 NW2d 787 (1945).]

The changing of the boundaries of political divisions is a legislative question, and the power to annex territory to municipalities has often been delegated to boards of supervisors or other public bodies. [*Oakman v Wayne Supervisors,* 185 Mich 359, 362; 152 NW 89 (1915).]

[4] The United States Supreme Court has held:

The annexation question is essentially political, and political considerations cannot be avoided whether the power is exercised by the Legislature itself or by an authority to which the power is delegated. The ultimate decision will be a value judgment based on the particular facts and circumstances of the annexation under consideration. . . . In this context it is . . . relevant that the power here delegated does not involve any vested right or legally protected interest.

* * *

[N]o governmental authority or person has any legal right in the boundaries of a city, village or township. [*Midland Twp v Boundary Comm*, 401

Municipal corporations are political subdivisions of the State, created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them. For the purpose of executing these powers properly and efficiently they usually are given the power to acquire, hold, and manage personal and real property. The number, nature and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the State. Neither their charters, nor any law conferring governmental powers, or vesting in them property to be used for governmental purposes, or authorizing them to hold or manage such property, or exempting them from taxation upon it, constitutes a contract with the State within the meaning of the Federal Constitution. The State, therefore, at its pleasure may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the State is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the Constitution of the United States. Although the inhabitants and property owners may by such changes suffer inconvenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason, they have no right by contract or otherwise in the unaltered or continued existence of the corporation or its powers, and there is nothing in the Federal Constitution which protects them from these injurious consequences. The power is in the State and those who legislate for the State are alone responsible for any unjust or oppressive exercise of it. [*Hunter v Pittsburgh*, 207 US 161, 178-179; 28 S Ct 40; 52 L Ed 151 (1907).]

Mich 641, 669, 670-671; 259 NW2d 326 (1977).]

Prior to 1970, all annexations had to be approved by the electors of the affected district, which was defined as "the whole of each city, village, or township from which territory is to be taken or to which territory is to be annexed," MCL 78.5, 117.9; MSA 5.1515, 5.2088. A majority vote in favor of the annexation was required, first, in the area to be annexed, and, second, in the remainder of the affected district "voting collectively." *Id.* These referenda elections frequently generated a great deal of divisiveness and litigation. See, e.g., *Goethal v Kent Co Supervisors,* 361 Mich 104; 104 NW2d 794 (1960); *Genesee Twp v Genesee Co,* 369 Mich 592; 120 NW2d 759 (1963); *Taylor v Dearborn Twp,* 370 Mich 47; 120 NW2d 737 (1963); *Saginaw v Saginaw Co Bd of Supervisors,* 1 Mich App 65; 134 NW2d 378 (1965); *Niles Twp v Berrien Co,* 5 Mich App 240; 146 NW2d 105 (1966).

The State Boundary Commission was created by 1968 PA 191, MCL 123.1001 *et seq.;* MSA 5.2242(1) *et seq.* In 1970, the Legislature delegated the authority over annexations to the commission. 1970 PA 219; see also 1972 PA 362. The background of 1970 PA 219 was, in 1977, described as follows:

I have been in the House for 13 years and I remember the emotional battles in the Legislature on annexation bills almost every year up to 1970.

Shortly before I started my first term in the House in 1965, a special annexation study committee, which had been appointed previously by Governor Swainson, submitted its report to Governor Romney. The basic recommendation in the report was to create a State Boundary Commission which would take the question of municipal boundary adjustments out of the arena of emotions (referenda elections) and put the question in the hands

of an impartial body which would include both
state and local representation and which would
make decisions on the basis of facts rather than
emotions.

I remember clearly the additional years of legis-
lative battles before the State Boundary Commis-
sion was created in 1968. Even then, in order to
get enough votes to create the Commission, the
Legislature compromised by dropping from the bill
the provisions relating to annexation.

\* \* \*

The annexation law before 1970, with a few
limited exceptions, was based on an automatic
election. The old law and the election requirement
obviously caused many problems.

The election provisions of the old law lead to
"strip annexations," leaving the township with
fragmented, oddly shaped, or widely separated
areas which made it almost impossible for the
township to provide even minimal township ser-
vices.

\* \* \*

[I]n 1970, a few Legislators got the Township
Association, the Municipal League, and the Bound-
ary Commission all together and worked out a
compromise to which all parties agreed.

Although the 1970 compromise is not perfect, it
certainly is better than the condition existing
before 1970. [Statement of Representative Ander-
son, 1977 House Journal 942.]

Under the 1970 amendment giving the commis-
sion authority over annexations, § 9 of the Home
Rule Cities Act, MCL 117.9; MSA 5.2088, became
the exclusive means of "annexation of territory
from a township or village to a home rule city,"
MCL 117.9(11); MSA 5.2088(11). With a few minor
exceptions, all annexations had to be approved by
the commission which, in processing and deciding
on requested annexations, had the broad discretion
delegated to it in 1968 PA 191 with respect to

petitions for incorporation.[5] MCL 117.9(2); MSA
5.2088(2). If the commission denied an annexation
or if it approved an annexation of territory on
which fewer than one hundred persons resided, its
decision was final. MCL 117.9(3), (4); MSA
5.2088(3), (4). If the commission approved an an-
nexation involving territory with more than one
hundred residents, however, its order of annex-
ation became final only if no petition was filed
within thirty days by twenty-five percent of the
registered electors "residing in the portion of the
territory approved for annexation, in the annexing
city or in the balance of the township," or if the
electors in areas filing such a petition approved of

---

[5] MCL 123.1008(1); MSA 5.2242(8)(1) provides:
   The commission shall review proposed incorporations consid-
ering the criteria established by section 9.

MCL 123.1009; MSA 5.2242(9) provides:

   Criteria to be considered by the commission in arriving at a
determination shall be:
   (a) Population; population density; land area and land uses;
assessed valuation; topography, natural boundaries and drain-
age basins; the past and probable future urban growth, includ-
ing population increase and business, commercial and indus-
trial development in the area. Comparative data for the incor-
porating municipality, and the remaining portion of the unit
from which the area will be detached shall be considered.
   (b) Need for organized community services; the present cost
and adequacy of governmental services in the area to be
incorporated; the probable future needs for services; the practi-
cability of supplying such services in the area to be incorpo-
rated; the probable effect of the proposed incorporation and of
alternative courses of action on the cost and adequacy of
services in the area to be incorporated and on the remaining
portion of the unit from which the area will be detached; the
probable increase in taxes in the area to be incorporated in
relation to the benefits expected to accrue from incorporation;
and the financial ability of the incorporating municipality to
maintain urban type services in the area.
   (c) The general effect upon the entire community of the
proposed action; and the relationship of the proposed action to
any established city, village, township, county or regional land
use plan.

the annexation by majority vote. MCL 117.9(5); MSA 5.2088(5). The effect of this legislation has been described as follows:

> [T]he 1970 compromise legislation (Act 219, PA 1970) . . . changed city annexation procedures by eliminating the election requirement in the case of small annexations.
>
> Compared to the inequities of the pre-1970 annexation procedures, the 1970 compromise achieved this: First, the townships got part of what they wanted, that is, the veto power over "large" annexations by providing for separate referendums in the balance of the township and in the area to be annexed.
>
> Second, the cities got part of what they wanted by transferring the jurisdiction over annexations from the County Boards of Supervisors to the Boundary Commission, and providing that the Commission could approve or veto all annexations, but with the provision that in "small" annexations, the Boundary Commission's approval would be final and would not be subject to referendum. [Statement of Representative Brotherton, 1977 House Journal 942-943.]

In 1977, HB 4030, which sought to amend § 34 of the Charter Township Act, MCL 42.1 *et seq.;* MSA 5.46(1) *et seq.,* was introduced in the House of Representatives.[6] 1977 House Journal 110. The

---

[6] The bill would have amended § 34 to provide:

(1) Except as provided in subsection (2), a portion of a charter township shall not be annexed to a city or village, but an entire charter township may be annexed to a city or village. An entire charter township or a portion of a charter township may incorporate as a city or village or may consolidate with another charter township or any other township, city, or village, with the approval of a majority of the township board and a majority of the electors in the charter township.

(2) Notwithstanding (1), a portion of a charter township which is contiguous on all sides with a city or village may be annexed by that city or village with the approval of the

purpose of the bill was to exempt charter townships from annexations of their territory. The issue in this case is whether the circuit court correctly interpreted a section of this bill, as ultimately enacted.

The problem HB 4030 was intended to remedy was described as follows:

> Charter township law does not prevent a portion of a charter township from being incorporated as a city or village or from being annexed to a city or village. In the past, in most cases where a portion of a charter township was annexed by a city, the part that was annexed included a valuable tax base such as an industrial facility or shopping complex. When this happens repeatedly, the township is fragmented, sometimes even broken up into non-adjacent enclaves. Further, the township loses its tax base and finds it nearly impossible to

majority of the electors in that portion of a charter township. [HB 4030 (January 25, 1977).]

As reported from the Committee on Towns and Counties, the following would have been added to HB 4030:

> (3) Notwithstanding subsections (1) and (2), a portion of a charter township contiguous to a city may be annexed to that city upon the filing of a petition with the county clerk by 20% of the registered voters in the area to be annexed or by a majority vote of the township board of the charter township, and approval by a majority of the qualified and registered electors voting on the question in the city to which the portion is to be annexed, and the township from which a portion is to be annexed, each counted separately.
>
> (4) If a referendum petition is filed pursuant to subsection (3), the county clerk, after determining the validity of the petition, shall order a referendum on the question of annexation. This referendum shall occur within 1 year after the validation of the petitions or the vote of the township board. The referendum shall be held at the first primary or general election held after the validation of the petition or the vote of the township board, or under section 639 of Act No. 116 of the public acts of 1954, as amended, being section 168.639 of the Michigan Compiled Laws. [1977 House Journal 354, as adopted by the House, 1977 House Journal 511.]

supply needed municipal services to its remaining residents. Some persons believe that if charter townships are to remain as a viable system of local government, they must be protected from such encroachment by adjacent cities. [House Legislative Analysis Section, First Analysis HB 4030 (March 3, 1977).]

On the basis of the assumption that annexations were harmful to townships,[7] the initial version of the bill had two primary components. First, subsection (1) of the bill essentially prohibited the annexation of portions of charter townships. Second, the exception to this absolute prohibition of partial annexations set forth in subsection (3) required the approval of the "majority of the qualified and registered electors voting on the question in . . . the township from which a portion is to be annexed,"[8] as well as the approval of the annexing city's electors.

---

[7] Proponents of the bill argued:

The very fact that a township has taken the initiative to become a charter township indicates that thought and effort have been put into the long range planning for the development of the township. Many charter townships are already largely developed and have water, sewer, and other municipal utility systems either planned or already in operation. In fact, many persons involved with local government view charter townships as "proto-cities" that, given the opportunity to develop properly, eventually will incorporate as home rule cities. It has been shown that townships that have remained intact (i.e., 36 square miles) are much more successful when incorporated than townships that have been fragmented by annexation. When annexation deprives a township of its choice portions, not only is long range planning thwarted, but with the loss of tax base, the township loses the ability to supply needed services. Thus, its future as a successful home rule city is destroyed. [House Legislative Analysis Section, First Analysis HB 4030 (March 3, 1977).]

[8] This language was amended to read "the portion of the township which is to be annexed," 1977 House Journal 682 (amendment proposed), 1978 House Journal 341 (amendment adopted). As enacted in 1978 PA 242, subsection (3) became § 34(5) and provided:

While proponents of the bill sought, on the whole, to prevent annexations, it appears that opposition to HB 4030 was based on several different grounds: the belief that such a strong shield against annexations was not good public policy,[9]

---

(5) Notwithstanding subsections (1) and (3), a portion of a charter township contiguous to a city or village may be annexed to that city or village upon the filing of a petition with the county clerk which petition is signed by 20% of the registered voters in the area to be annexed *and approval by a* majority of *the* qualified and registered *electors* voting on the question *in the city or village to which the portion is to be annexed, and the portion of the township which is to be annexed, with the vote in each unit to be counted separately.* [Emphasis added.]

This language would appear to mean that, with respect to annexations initiated as provided in this § 34(5), township electors are not permitted to vote on the question of annexation at all.

Before the changes in annexation procedures effected by 1970 PA 219, township electors were permitted to vote on all annexations of their territory by villages, and by cities with populations of over 15,000 persons. MCL 78.5, 117.9; MSA 5.1515, 5.2088. The village or city and township votes were counted collectively. While it is possible that the township electors were consequently often outvoted by the more populous cities or villages, townships were able to participate in the referendum on the annexation question. With the changes effected by 1970 PA 219, townships on the one hand lost the right to vote on smaller annexations, but on the other hand gained the right to have their votes counted separately in—and thus to veto—larger annexations. Furthermore, townships gained the opportunity to present their case to the commission, which could veto any annexation. In comparison, the language of § 34(5) on its face would seem to reduce, as compared to townships and charter townships subject to MCL 117.9; MSA 5.2088 procedures, the protection against, and participation in decision-making on, annexations for charter townships which qualify for "exemption" pursuant to § 34(1).

The meaning and effect of MCL 42.34(5); MSA 5.46(34)(5) is not before us and has not been briefed or argued. We thus express no opinion on the section's meaning or effect. We merely note that its language makes understanding the legislative intent in enacting 1978 PA 242 difficult. See, e.g., Statement of Representative DeStigter, 1978 House Journal 377 (opposing HB 4030 with the amended § 34[5] language on the grounds that the bill would "forever seal[ ]" city boundaries); Statement of Senator Welborn, 1978 Senate Journal 1200-1201 (opposing the addition of § 34[1] to HB 4030 on the grounds that it would "gut" the bill by depriving smaller charter township electors of the right to vote on annexations).

the concern that the bill created an unjustified
incentive to townships to incorporate,[10] the desire

[9] Usually, even in charter townships, only a small portion of
the township is highly developed and ready for incorporation. It
may be many years before the remainder of the township is
ready for incorporation. The restriction on annexation proposed
by the bill could have 2 undesirable effects. On the one hand, it
could delay the incorporation of a highly developed area which
needs, and could support, city services. Conversely, if the entire
township is incorporated or annexed, and only a small area is
developed, the residents in the undeveloped areas of the town-
ship would be forced to pay city taxes, even though city utilities
and other services may not be available in the outlying areas
for several years. [First Analysis of HB 4030, House Legislative
Analysis Section (March 3, 1977).]

Some representatives also appear to have been concerned that such
protection against annexations would be abused:

Eliminating enclaves that are receiving, without paying for[,]
city services, was one strong reason why the Boundary Commis-
sion came into existence. This amendment would give unilat-
eral veto power over annexations which are reasonable and
have been so determined by the Boundary Commission to these
small, illogical areas. [Statement of Representative McNamee,
1977 House Journal 943.]

[10] Opponents were concerned that HB 4030 would create an incen-
tive for unsuited townships to incorporate:

There are, at present, 20 charter townships in the state.
However, Public Act 90 of 1976 (House Bill 5193) enacted
provisions which would make it much easier for townships with
populations over 5,000 to become charter townships. (According
to the 1970 census, there are 124 townships with populations of
5,000 or more.) Some persons fear that the ease of achieving
charter status provided by Public Act 90 coupled with the
protection from annexation which this bill would provide would
encourage many general law townships to become charter
townships prematurely, long before the level of development in
the township would call for such a move. Although an area
that wishes to incorporate as a city or village has to meet
certain requirements, including density requirements, and gain
the approval of the State Boundary Commission, there is no
such state review when a general law township wishes to move
to charter status. Further, it should be pointed out that al-
though the 36 square mile township is typical in southern
Michigan, north of the Bay City line many townships are much
larger, up to nearly 150 square miles. By virtue of this large
land area, these townships may have more than 5,000 inhabit-

to adhere to the 1970 compromise,[11] an opposition

ants, even though the population density is low and the township is largely rural. It would be an absurdity for such townships to move to charter status because of the impetus this bill would provide. [First Analysis of HB 4030, House Legislative Analysis Section (March 3, 1977).]

Indeed, some opponents were concerned, not only that the bill would create an incentive for unjustified township incorporations, but also that the bill would in fact force townships to incorporate.

I have 3 charter townships in my district. If House Bill No. 4030 passes, half the boundary of the City of Holland, and half the boundary of the City of Zeeland would be forever sealed by Holland Charter Township. The City of Hudsonville is almost entirely surrounded and would be locked in by Georgetown Charter Township.

If this bill passes, other townships would be forced to defensively incorporate as a charter township in order to preclude those cities from expanding in their direction. [Statement of Representative DeStigter, 1978 House Journal 377.]

[11] Opponents of HB 4030 argued that the bill was unnecessary because the new authority of the commission over annexation resolved the previous problems:

Opponents of the bill contend that the problems caused by the annexation of portions of charter townships occurred before the Boundary Commission had authority over such matters, and believe that the commission has taken the deleterious effects of annexation into account and has acted to protect charter townships if a proposed annexation would impair the ability of the township to incorporate at a future date. [House Legislative Analysis Section, First Analysis HB 4030 (March 3, 1977).]

Indeed, some of the opposition to HB 4030 appears to have been, at least partially, based on the belief that the compromise achieved in 1970 should not so soon be abandoned. For instance, one representative explained that he voted "no" on an amendment to HB 4030 which was supportive of the goals of the bill as originally introduced

because, at least as to charter townships, it destroys the reasonable approach to annexation under the State Boundary Commission's supervision.

It substantially destroys the intent and purpose of the 1970 compromise legislation (Act 219, PA 1970) which changed city annexation procedures by eliminating the election requirement in the case of small annexations. [Statement of Representative Brotherton, 1977 House Journal 942; see also Statements of Representatives Anderson and Ryan, id.]

to the township veto power,[12] and the belief that

Proponents of HB 4030, however, believed that the commission's authority provided insufficient protection for townships:

> [S]ome persons believe that protection for townships should be very clearly spelled out in the statute.
>
> *    *    *
>
> Some persons believe that the State Boundary Commission has not always been properly sensitive to the needs of the townships, and further believe that there are not sufficient safeguards in the law to ensure that the commission will always protect township interests in the future. They contend that the bill is not so much a matter of usurping the authority of the commission as of giving the commission guidelines to follow when a proposed annexation would affect a charter township. [House Legislative Analysis Section, First Analysis HB 4030 (March 3, 1977).]

[12] While one proponent of the bill argued that the voting powers set forth in subsection (3) were justified because "the right of the people to vote . . . on annexations . . . [is] what the whole issue is about—allowing the people in a township to be treated as, not as second class citizens, but as the same citizens as anybody else in this state[,]" statement of Senator Welborn, 1978 Senate Journal 1201, opponents of the bill argued that such a township "right to vote" actually had the effect of giving townships the power to veto annexations:

> [T]he provision allowing for annexation of a portion of a charter township if voters in both the township and the city approve is deceptive since the township, in effect, has veto power over the annexation. . . . [T]he result of such a provision is to effectively prevent such annexations. [First Analysis of HB 4030, House Legislative Analysis Section (March 3, 1977).]

Thus, opponents argued, subsection (3) of proposed HB 4030 essentially gave charter townships a veto power over all annexations of their territory, even in cases in which the majority of electors in the city seeking to annex, and in the territory proposed to be annexed, voted in favor of the annexation.

This charter township veto power over annexations appears to have been a major source of opposition to the bill. Representative Brotherton, for instance, explained his "nay" vote on an amendment to HB 4030 which was supportive of the original goals of the bill as follows:

> House Bill No. 4030 proposes to change city annexation procedures by giving charter townships a power that the Legislature refused to give all townships in 1970, the complete veto power over all annexations. I believe the present annexation law is reasonable and is much better than what we had before 1970. For this reason, I voted no on this amendment to House

the referendum process was not desirable for an-
nexation decisions.[13] These divergent interests and

---

Bill No. 4030. [1977 House Journal 942-943; see also Statements
of Representatives Anderson, Ryan, and McNamee, *id.*]

[13] The view of some opponents that a return to the referendum
process for annexations was undesirable was related to the desire to
uphold the 1970 compromise.

[A]s a member of the House since 1955, I know of the efforts
to provide more rational municipal boundary adjustment proce-
dures. The first step was taken in 1968 when the State Bound-
ary Commission was created.

I well remember the lengthy stalemate in the House in 1970
on a bill to change the Home Rule City [sic] Act annexation
election procedures. Its original purpose was to give the town-
ship electors a separate veto vote. The bill was amended to
reflect a compromise that was worked out by the Legislature to
resolve many inequities caused by annexation elections. The
purpose of the compromise was to eliminate annexation elec-
tions entirely in small annexations and to give townships the
veto power through referendum elections in large annexations.

The compromise which became Act 219, PA 1970, was not
perfect. A compromise is seldom perfect. Our compromise, for
example, could have given the County Boards of Commission-
ers, instead of the Boundary Commission, the power to arbi-
trate and decide small annexations. We could have set a
percentage of State Equalized Value, rather than settling on
100 persons in the annexation area[,] as the definition of a
small annexation.

The important fact, however, is that, after lengthy delibera-
tion and debate, the Legislature established a significant public
policy when it changed the election requirements on annex-
ation questions. The Legislature made, I believe, a wise and
conscious decision to remove certain kinds of annexations from
the emotional arena of the ballot box.

The Legislature in 1970 decided to remove certain annex-
ations from the election process. I oppose a retreat from that
decision. [Statement of Representative Ryan, 1977 House Jour-
nal 942.]

Indeed, one representative characterized the bill as "a ridiculous step
backwards" on these grounds:

I have been in the Legislature since 1965 and have gone
through the battles over annexation bills on this floor as have
other members who were here during the 1960's. I think we
should retain and improve rather than start to destroy the
more rational approach the Legislature made possible when we
created the Boundary Commission in 1968 and changed city

views spawned many amendments to the proposed
bill during the year and a half it remained pend-
ing before the Legislature. See History of HB 4030,
1978 House Journal 6667, 1978 Senate Journal
2935.

Various amendments, primarily added to the bill
by the House, added several exceptions to the
original, relatively absolute, exemption of charter
townships from annexation.[14] Section 34(1), the

annexation procedures in 1970. We have moved partly away
from the old "battle at the ballot box" election procedure, at
least as to "small" annexations which are now subject to the
final authority of the Boundary Commission and are not subject
to referendum.

We have laws authorizing county health departments to
order polluting septic tanks sealed and ordering the condemna-
tion of properties that are polluting. These orders are not
subject to popular referendum. We have laws authorizing the
Water Resources Commission to order townships to proceed to
install expensive sewer systems and these orders are not sub-
ject to referendum. In fact these orders can be enforced in
court by court-ordered general obligation bonds without a vote
of the people.

But when it comes to an order of the Boundary Commission
for the annexation of an area to a city which could provide the
services needed to correct these serious problems, that order (if
it involves an area where more than 100 people reside) is
subject to veto by referendum both in the area as well as in the
balance of the township.

House Bill No. 4030 now proposes to take the ridiculous step
backwards of allowing local referendums also on Boundary
Commission orders involving areas of less than 100 people. This
doesn't make sense to me.

We ought to be making improvements in our annexation
laws rather than destroying the more sensible system we
finally adopted in 1970. For this reason I voted against House
Bill No. 4030. [Statement of Representative DeStigter, 1978
House Journal 377.]

[14] As finally enacted, the bill permitted annexations from charter
townships qualifying under § 34(1) in the following circumstances:

(2) Notwithstanding subsection (1), the state boundary com-
mission may, under procedures initiated and conducted pursu-
ant to section 9 of Act No. 279 of the Public Acts of 1909, being
section 117.9 of the Michigan Compiled Laws, order a portion
or portions of a charter township to be annexed as necessary to

eliminate free standing islands of the township completely surrounded by an annexing city, or to straighten or align the exterior boundaries of the city or village in a manner that the charter township and city or village contain uniform straight boundaries wherever possible.

(3) Notwithstanding subsection (1), a portion of a charter township which charter township is contiguous on all sides with a city or village may be annexed by that city or village with the approval of a majority of the electors in that portion of a charter township.

(4) Notwithstanding subsection (1), if a qualified elector does not reside in the territory proposed to be annexed which is contiguous to the city or village other than the 1 or more persons petitioning, or if a petition signed by 1 or more persons, firms, corporations, the United States government, or the state or any of its subdivisions which collectively hold the recorded legal title to more than ½ of the area of the land in the territory to be annexed is filed with the city or village and with the township board of the charter township in which the territory is situated, the annexation may be accomplished by the affirmative majority vote of the city council or village board of the city or village and the approval of the charter township board of the township.

(5) Notwithstanding subsections (1) and (3), a portion of a charter township contiguous to a city or village may be annexed to that city or village upon the filing of a petition with the county clerk which petition is signed by 20% of the registered electors in the area to be annexed and approval by a majority of the qualified and registered electors voting on the question in the city or village to which the portion is to be annexed, and the portion of the township which is to be annexed, with the vote in each unit to be counted separately.

(6) If a petition is filed pursuant to subsection (5), the county clerk, after determining the validity of the petition, shall order a referendum on the question of annexation. This referendum shall occur within 1 year after the validation of the petitions. The referendum shall be held at the first primary or general election held in that county not less than 60 days after the validation of the petition, or under section 639 of Act No. 116 of the Public Acts of 1954, as amended, being section 168.639 of the Michigan Compiled Laws.

(7) A village having a population of 4,200 or more shall not be annexed to a contiguous unit of government unless a majority of the qualified and registered electors residing within the village vote in favor of the annexation at an election held pursuant to Act No. 116 of the Public Acts of 1954, as amended, being sections 168.1 to 168.992 of the Michigan Compiled Laws.

(8) The common boundary of a charter township and a city or village may be adjusted by resolution approved by a majority of each of the respective governing bodies after the governing bodies give 90 days notice to property owners in the area

section of the statute involved in the present case, was added to HB 4030 by Senate amendment.[15]

While prior to this amendment HB 4030 had exempted all charter townships, the addition of § 34(1) exempted charter townships which incorporated after the act's effective date only if they met the listed standards. The bill was enacted with this amendment.[16] The issue before the commission was whether Shelby met the § 34(1)(f) standard, and was consequently exempt from annexation.

---

proposed for the boundary adjustment, and the governing bodies conduct a public hearing on the proposed boundary adjustment. [MCL 42.34(2)-(8); MSA 5.46(34)(2)-(8), as amended by 1978 PA 591.]

[15] It provided:

(1) Any charter township existing on the effective date of this act and any township thereafter incorporated as a charter township that complies with the following standards, shall be exempt from annexation to any contiguous city except as provided in subsections (2), (3), (4), (5), (6), (7), and (8):

(A) Has a state equalized valuation of not less than $25,000,000.

(B) Has a minimum population density of 150 persons per square mile to be determined by the secretary of state by dividing the most recent regular or special census of population by the number of square miles then under the jurisdiction of the charter township not to include the population or territory within the jurisdiction of an incorporated village.

(C) Provided fire protection service by contract or otherwise.

(D) Is governed by a comprehensive zoning ordinance or master plan.

(E) Provides solid waste disposal services to township residents, within or without the township, by contract, license or municipal ownership.

(F) Provides water and or sewer services by contract or otherwise.

(G) Provides police protection through contract with the sheriff in addition to normal sheriff patrol or through its own police department. [1978 Senate Journal 1196, 1200.]

[16] Section 34(1), as enacted by 1978 PA 242, was amended the same year by 1978 PA 591. Pertinent changes made by 1978 PA 591 are discussed below.

ANALYSIS

The circuit court held that the commission's order of annexation must be set aside because the commission had exceeded its statutory authority in deciding that Shelby did not provide sufficient water or sewer services to qualify for exemption from annexation under § 34(1). The court found that § 34(1)(f) requires only that a charter township provide *any* water or sewer services. The Court of Appeals affirmed this construction of § 34(1)(f).[17] Thus, the question before this Court is whether the lower courts correctly construed § 34(1)(f) to require only the provision of any water or sewer services.

A court is obligated to read a statute as written "[i]f the language employed in a statute is plain, certain and unambiguous," *Grand Rapids v Crocker,* 219 Mich 178, 182; 188 NW 221 (1922). See also *Dussia v Monroe Co Employees Retirement System,* 386 Mich 244, 248-249; 191 NW2d 307 (1971); *Selk v Detroit Plastic Products,* 419 Mich 1, 8; 345 NW2d 184 (1984). However, this statute is not unambiguous. The language "[p]rovides water or sewer services, or both . . ." is susceptible to more than one meaning. The language could be understood as meaning that the provision of "any" such services is sufficient. The language could also be understood to mean that a charter township must provide "complete" water or sewer services, that is, to all its residents at the optimal level. Since the statute is reasonably susceptible to more than one meaning, it is not unambiguous.

---

[17] The Court of Appeals did not hold that § 34(1)(f) required the provision of "more than token" water or sewer services, but instead held that the courts would not apply the statute "literally" if only token services were provided. Thus, the Court of Appeals adopted the circuit court's interpretation of the statute as requiring only the provision of any water or sewer services.

When a statute is ambiguous and susceptible to two or more constructions that could cause reasonable minds to disagree as to its meaning, the statute must be interpreted. *City of Lansing v Lansing Twp*, 356 Mich 641, 649; 97 NW2d 804 (1959). Therefore, we must determine whether § 34(1)(f) requires no more than the provision of any water or sewer services.

If the requirement of § 34(1)(f) is satisfied by the provision of "any" water or sewer services, a charter township fulfilling the other requirements set forth in § 34(1) which, for instance, provided water to one household in its territory would qualify for exemption from annexation. Thus, the provision of de minimus services would suffice for exemption, and the standard set forth in § 34(1)(f) would be no more than a pro forma requirement. While the Legislature could have imposed no more than a de minimus, pro forma standard as a prerequisite for exemption, we are unable to conclude that the Legislature did so.

Shelby has not advanced an acceptable explanation as to why the Legislature should have granted exemption from annexation to charter townships providing de minimus services, while leaving charter townships which do not meet that pro forma requirement subject to annexation. It is unlikely that the Legislature would create an incentive for the inefficient pro forma provision of de minimus services, particularly when one of the concerns about the bill was that it would encourage unwarranted incorporations by townships. See n 10. To interpret the standard as imposing purely pro forma requirements is also inconsistent with the substantive nature of other standards contained in § 34(1). It is particularly unlikely that the Legislature would require a [sic] certain population density as a prerequisite for exemption from annex-

ation, yet intend that the provision of water to one of those residents should be sufficient for exemption.

The legislative history of § 34 also indicates that the standards set forth in § 34(1) were intended to impose more than de minimus, pro forma standards. First, the addition of the § 34(1) requirements significantly reduced the House opposition to HB 4030. Forty-one representatives opposed the House version of the bill, which exempted all charter townships. 1978 House Journal 376-377. When HB 4030 returned to the House with the Senate amendment adding § 34(1),[18] however, only six representatives voted against the bill. 1978 House Journal 1950. It is unlikely that the addition of these prerequisites for exemption from annexation would have so substantially reduced the House opposition to the bill if the standards set forth were merely pro forma, de minimus requirements.

Second, the comments of the only legislator to speak in opposition to the addition of § 34(1) to HB 4030 indicate that the standards were not understood as merely de minimus requirements. He stated that the proposed amendment adding § 34(1)

> gut[s] the bill to the point that we don't allow the people of a township to have the right to vote if they want to be annexed to a city unless they meet a [sic] certain criteria. Let me point out one of them. One of the criteria for the question on annexation is that the township provides water or sewer services by contract or otherwise. What we are, in effect, saying is that you townships that are big enough, or you have a municipality that's adjacent

---

[18] While the Senate made some other amendments to the House version of the bill, including the additions of §§ 34(4) and (8), see 1978 Senate Journal 1043, 1196, 1200, the addition of § 34(1) appears to have been the major, most important change.

to you that's cooperative and willing to allow a contract, will be in a position of saying that we're going to protect you from annexation. But to the smaller township or to the township that's located adjacent to a city that says I don't want to give you a contract for sewer or water, they are going to be thrown at the mercy of that city just by going out for land grab, for tax base as is happening now.

This amendment will take away the right of the people to vote in the smaller townships on annexation, and that's what the whole issue is about—allowing the people in a township to be treated as, not as second class citizens, but as the same citizens as anybody else in this state. This is splitting the issue, most certainly, conceding to the larger townships, the more power townships, but we're hurting the residents in the smaller townships who, perhaps, do not have that availability.

What House Bill No. 4030 said, as it was originally drafted and passed out of the committee, was that people in an area that was up for annexation would have the right to vote if they're going to be annexed. Now, this puts on a whole series of or longer list of criteria they must meet to be qualified in order to be able to vote. [Statement of Senator Welborn, 1978 Senate Journal 1201.]

These remarks clearly imply that § 34(1)(f) imposes a substantive, and not a de minimus, requirement.

Third, an amendment of § 34(1) enacted the same year also strongly indicates that the standards set forth in that section impose substantive requirements. 1978 PA 591 amended the first sentence of § 34(1) to read:

A charter township existing on June 15, 1978, or a township incorporated after June 15, 1978 as a charter township that complies with the following standards, is exempt from annexation . . .

in order

to make clear that charter townships which ex-

isted at the time of the enactment of Public Act
242 are vulnerable to annexation only under the
very specific conditions enumerated in the act and
need meet no other criteria to enjoy the protection
of that act. [House Legislative Analysis Section,
Analysis HB 6708 (December 7, 1978).]

It is unlikely that the Legislature would have gone
to the trouble of making it absolutely clear that
existing charter townships need not meet the stan-
dards set forth in § 34(1)(a)-(f) in order to qualify
for § 34(1)'s exemption if those standards had im-
posed merely de minimus, pro forma requirements.

Shelby points out that 1978 PA 591 also
amended § 34(1)(f), which as enacted by 1978 PA
242 had read "[p]rovides water *and or* sewer ser-
vices by contract or otherwise," to read "[p]rovides
water *or* sewer services, *or* both, by contract or
otherwise." Shelby alleges that the original ver-
sion of § 34(1)(f) had read "water *and* sewer ser-
vices." Shelby argues that

[t]he steady progression from use of the conjunc-
tive term *"and"* in original House Bill No 4030 to
the *double use* of the disjunctive *"or"* and *"or
both"* in 1978 PA 591 is proof of a measured
legislative intent to ease the standards needed to
attain exemption from annexation.

Rather than supporting the construction of the
statute Shelby urges, that the provision of "any"
water or sewer services is sufficient to satisfy the
statute's requirements, this legislative history sup-
ports the opposite conclusion. There would have
been no real need to reduce the standard from
"water *and* sewer services" to "water *and or* sewer
services" to "water *or* sewer services, *or both,"* if
the requirement of providing water and sewer

services were purely a de minimus, pro forma standard. Furthermore, that the Legislature *reduced* the substantive requirement does not indicate that it also *transformed* what were substantive requirements into purely pro forma standards. Instead, that the Legislature expressly acted to reduce the services a charter township had to provide in order to qualify for exemption, but did not in any way indicate an intention to move from substantive service requirements to purely pro forma service requirements, implies that it had no intention of doing so. Thus, this legislative history also supports the conclusion that the standard contained in § 34(1)(f) imposes more than a pro forma, de minimus requirement.

We consequently conclude that the lower courts erred in construing § 34(1)(f) to require no more than the provision of any water or sewer services. The commission therefore did not exceed its statutory authority by not applying this interpretation of the statute to this case. The judgment of the circuit court setting aside the commission's order on those grounds, and the Court of Appeals affirmance, were thus error and must be reversed. We remand this case to the circuit court for consideration of Shelby's other claims of error.

WILLIAMS, C.J., and BRICKLEY and CAVANAGH, JJ., concurred with BOYLE, J.

LEVIN, J. The question presented is whether the State Boundary Commission[1] was authorized to order the annexation of approximately one-half square mile located in Shelby Township to the City of Utica. We would affirm the decision of the Court of Appeals which, in affirming the circuit court,

[1] The commission is created under 1968 PA 191, MCL 123.1001 *et seq.;* MSA 5.2242(1) *et seq.*

held that amendments in 1978[2] of the charter
township act[3] precluded the State Boundary Com-
mission from annexing to the City of Utica any
property in Shelby Township because Shelby
Township is a charter township that "[p]rovides
water or sewer services, or both."[4]

The opinion of the Court states that the circuit
court construed the statute as requiring "no more
than the provision of *any* water or sewer service";[5]
"[s]ince Shelby provided *some* water and sewer
services"[6] (emphasis supplied), the circuit court set
aside the order of annexation entered by the
boundary commission. The opinion of the Court
acknowledges that the "Court of Appeals affirmed
with the qualification that '[a] township that only
provided *token* services would not be exempt un-
der this statute since courts will depart from a
literal construction of a statute when such a con-
struction would produce absurd and unjust re-
sults.' 129 Mich App 656." (Emphasis added.)[7]

Nevertheless, the opinion states that the Court
of Appeals adopted the circuit court's "*any* water
or sewer service" construction "that § 34(1)(f) re-
quires only that a charter township provide *any*
water or sewer services. The Court of Appeals
affirmed this construction of § 34(1)(f)." (Emphasis
in original.)[8] The Court then states the question
before us to be

whether the lower courts correctly construed

---

[2] 1978 PA 242 and 591, amending MCL 42.34(1); MSA 5.46(34)(1).

[3] MCL 42.1; MSA 5.46(1).

[4] MCL 42.34(1)(f); MSA 5.46(34)(1)(f).

[5] *Ante,* p 55.

[6] *Id.*

[7] *Ante,* p 56.

[8] *Ante,* p 72.

§ 34(1)(f) to require only the provision of *any* water
or sewer services. [Emphasis added.][9]

The opinion of the Court continues with this
analysis:

> If the requirement of § 34(1)(f) is satisfied by the
> provision of "any" water or sewer services, a char-
> ter township fulfilling the other requirements set
> forth in § 34(1) which, for instance, provided water
> to *one household* in its territory would qualify for
> exemption from annexation. Thus, the provision of
> *de minimis* services would suffice for exemption,
> and the standard set forth in § 34(1)(f) would be no
> more than a *pro forma* requirement. While the
> Legislature could have imposed no more than a *de
> minimis, pro forma* standard as a prerequisite for
> exemption, we are unable to conclude that the
> Legislature did so. [Emphasis added.][10]

The opinion of the Court concludes:

> We consequently conclude that the lower courts
> erred in construing § 34(1)(f) to require no more
> than the provision of *any* water or sewer services.
> The commission therefore did not exceed its statu-
> tory authority by not applying this interpretation
> of the statute to this case. The judgment of the
> circuit court setting aside the commission's order
> on those grounds, and the Court of Appeals affir-
> mance, were thus in error and must be reversed.
> We remand this case to the circuit court for con-
> sideration of Shelby's other claims of error. [Em-
> phasis added.][11]

Neither the circuit court nor the Court of Ap-
peals construed the statute to mean that the provi-
sion of "*any* water or sewer service" to even "one

[9] *Id.*
[10] *Ante,* p 73.
[11] *Ante,* p 77.

household" would exempt a charter township from
the operative effect of the provisions of the state
boundary commission act.

Shelby Township provides more than thirty per-
cent of its residents, 11,600 persons, with water
service. This is clearly more than providing water
and sewer service to one household and is clearly
more than *de minimis* or *pro forma* service. The
boundary commission found that Shelby Township
could provide water service to eighty-five percent
of the land area of the township through existing
contracts and capacities.

There is no evidence that it would not be possi-
ble to provide water or sewer service to the 302
acres proposed for annexation. Perhaps it would be
less costly for the City of Utica to provide such
service than to extend water or sewer lines in
Shelby Township to provide such service. The
statute does not, however, require that water or
sewer service be provided to all the land area in a
charter township or to a majority of the land area
or some other fixed percentage of the land area.

To require that service be provided to the land
area proposed to be annexed would in effect be to
construe the statute as requiring that service be
provided to all pertinent land areas, thereby mak-
ing the generalized exemption from State Bound-
ary Commission jurisdiction meaningless. It must
be an unusual township that provides water and
sewer service to all land areas in the township.
The cost of building water and sewer lines is
generally defrayed by special assessment against
the property to be benefited, and such special
assessments are not ordinarily levied, or such
water or sewer lines laid, in sparsely populated
areas. One must therefore expect that few, if any,
charter townships organized after June 15, 1978,
would be regarded as providing water or sewer
service if the amendatory legislation is construed

as requiring that service be provided to the land area proposed to be annexed.

The opinion of the Court apparently leaves open the question whether a charter township that provides water or sewer service to more than thirty percent of its residents is exempt from an annexation order of the State Boundary Commission. It reverses the decision of the Court of Appeals on a contrary-to-fact hypothesis, stating that service to "one household" would not be sufficient to exempt a charter township.

When this Court reverses the Court of Appeals, we are obliged to state a reason. The opinion of the Court fails to state a reason when it ignores, in stating the basis of reversal, the Court of Appeals acknowledgment that a township that only provides token service would not be exempt and states, rather, incorrectly that the Court of Appeals erred in requiring "no more than the provision of any water or sewer services." The Court of Appeals affirmed the decision of the circuit court because Shelby Township provided "far more than token water and sewer services."

No reliance can properly be placed on the construction of the State Boundary Commission under the circumstance that the purpose of the 1978 amendment is to reduce its power and that it opposed this legislation.

We would affirm the decision of the Court of Appeals because the provision of water service to more than thirty percent of the residents of a charter township constitutes providing water service within the meaning of the 1978 amendments of the charter township act.

RILEY, J., concurred with LEVIN, J.

ARCHER, J., took no part in the decision of this case.