AHEARN v BLOOMFIELD CHARTER TOWNSHIP

Docket No. 204335. Submitted December 1, 1998, at Detroit. Decided May 14, 1999, at 9:00 A.M. Leave to appeal sought.

Brian Ahearn and others brought a class action in the Oakland Circuit Court against Bloomfield Charter Township, challenging a special assessment district that had been created by the defendant to pay for its share of the cost of construction of the Lincoln Hills CSO Retention Treatment Basin (RTB). Although the class was never certified, the parties stipulated that the defendant would adhere to the result reached in the plaintiffs' action with respect to all the property owners in the special assessment district. The plaintiffs live in a portion of the defendant township that is served by a combined sanitary and storm sewer system. As a result of the combined sewer system, untreated sewage was diverted into the Rouge River during periods of heavy precipitation. Pursuant to a federal mandate to clean up the pollution of the Rouge River, the defendant and other municipalities served by the combined sewer system were given the option to correct the pollution problem by either replacing the combined sewer system with a two-pipe system in which sanitary and storm sewers were separate or constructing the RTB to handle the extra volume of sewage during periods of heavy precipitation. The defendant and other municipalities opted for adding the RTB to the existing combined system. In order to pay its share of the cost of the RTB, the defendant created a special assessment district comprised of all the parcels in the township that were served by the combined system. The plaintiffs asserted that the special assessments were invalid because the RTB project did not confer any special benefit on their properties, the RTB project did not result in an increase in the value of their properties, and the use of special assessments were contrary to the provisions of a township ordinance that required rates and charges for the maintenance and replacement of the sewer system to be uniform within the area served by the defendant. Following an unsuccessful attempt by the defendant to have the matter removed to federal court, the defendant moved for summary disposition. The court, Denise Langford-Morris, J., finding that the RTB conferred a special benefit on the plaintiffs' properties, that special assessments were proportional to the special benefit conferred, and that the RTB was

a capital improvement that was not within the contemplation of the maintenance and replacement language of the township ordinance, granted summary disposition for the defendant. The plaintiffs appealed.

The Court of Appeals *held*:

1. A special assessment is designed to recover the costs of improvements that confer local and peculiar benefits upon property within the assessment district. For a special assessment to be deemed valid, it must meet two requirements: the improvement funded by the special assessment must confer on the assessed properties a special benefit beyond that provided to the community as a whole, and the amount of the special assessment must be proportionate to the benefits derived from the improvement. In order for an improvement to be deemed to have conferred a special benefit, the improvement must cause an increase in the market value of the land that is subject to the special assessment. An increase in market value is also necessary to find that the benefit is proportionate to the cost incurred.

2. The plaintiffs argued that the benefit conferred by the construction of the RTB was a cleaner Rouge River, a benefit that inured to the community as a whole rather than to their properties in particular, and that, accordingly, there was no special benefit to their properties that would justify the funding of the costs of the RTB through a special assessment. The plaintiffs' argument fails to recognize that the special benefit they received was continued sewer service by the defendant. As a result of a federal mandate to cease to discharge untreated sewage into the Rouge River, the defendant could not continue to operate its sewer system without either participating in the construction of the RTB or replacing the combined sewer system with separate sanitary and storm sewers. Because the federal mandate required the construction of the RTB in order for the defendant to continue to operate its sewer system and because there was no affirmative duty imposed on the defendant to continue to provide sewer service to the plaintiffs, the special benefit conferred on the plaintiffs' properties by the construction of the RTB was continued sewer service to their respective properties.

3. Whether the market value of a property subject to a special assessment has been increased as a result of the improvement for which the special assessment is levied depends not on a comparison between the market value of the assessed property after the improvement and the market value of the assessed property before the improvement, but on a comparison between the market value of the assessed property with the improvement and market value

of the assessed property without the improvement. Although it is undisputed that the construction of the RTB caused no discernible change in the market values of the plaintiffs' properties, the construction of the RTB did undoubtedly result in higher market values for those the properties than they would have had if the RTB had not been built and the defendant had ceased to provide sewer service to those properties. In the absence of a showing to the contrary by the plaintiffs, the determination by the defendant in creation of the special assessment district that the construction of the RTB resulted in increases in market value of the plaintiffs' properties will not be disturbed.

4. Bloomfield Charter Township Ordinance No. 454 provides that the rates and charges for the sewer system are to be "sufficient to provide for debt service and for the expenses of operation, maintenance and replacement of the system as necessary to preserve the same in good repair and working order" and "shall be uniform within the area serviced by the Township of Bloomfield." Because the clear and unambiguous language of Ordinance No. 454 addresses rates and charges necessary for the operation and preservation of the existing sewer system, the uniform rate requirement of the ordinance does not apply to the initial funding of capital improvements. Because the construction of the RTB was a capital improvement, the funding of that construction was not subject to the requirement of Ordinance No. 454 that the cost of the improvement be funded by uniform sewage fees.

Affirmed.

1. Taxation — Special Assessments — Special Benefit to Assessed Properties.

A special assessment is designed to recover the costs of improvements that confer local and peculiar benefits upon property within the assessment district and must meet two requirements to be deemed valid: the improvement funded by the special assessment must confer on the assessed properties a special benefit beyond that provided to the community as a whole, and the amount of the special assessment must be proportionate to the benefits derived from the improvement.

2. Taxation — Special Assessments — Special Benefit to Assessed Properties — Increased Value of Assessed Properties.

An improvement that is to be funded by a special assessment is deemed to have conferred a special benefit on the properties that are subject to the special assessment only where the improvement causes an increase in the market value of the land that is specially assessed.

3. TAXATION — SPECIAL ASSESSMENTS — SPECIAL BENEFIT TO ASSESSED PROPER-
    TIES — SEWER SYSTEMS — POLLUTION ABATEMENT.

   The construction of a retention treatment basin in a combined sani-
   tary and storm sewer system to satisfy a federal mandate to avoid
   the pollution of a river by the abatement of discharges of untreated
   sewage into the river confers a special benefit on the users of the
   combined sewer system such as will support the creation of a spe-
   cial assessment district of the users of the combined system for the
   funding of the treatment basin where, in the absence of the addi-
   tion of the basin to the combined system or the modification of
   that system, the continued use of the combined sewer system
   would have been prohibited.

4. TAXATION — SPECIAL ASSESSMENTS — INCREASED MARKET VALUE OF ASSESSED
    PROPERTIES.

   Whether the market value of a property that is subject to a special
   assessment has been increased as a result of the improvement for
   which the special assessment is levied depends not on a compari-
   son between the market value of the assessed property after the
   improvement and the market value of the assessed property before
   the improvement, but on a comparison between the market value
   of the assessed property with the improvement and the market
   value of the assessed property without the improvement.

*Hainer, Demorest & Berman, P.C.* (by *Mark S.
Demorest*), for the plaintiffs.

*Secrest, Wardle, Lynch, Hampton, Truex and Mor-
ley* (by *William P. Hampton* and *Lanie Anderson*),
for the defendant.

Before: MCDONALD, P.J., and JANSEN and TALBOT, JJ.

TALBOT, J. Plaintiffs appeal as of right the circuit
court's order granting defendant's motion for sum-
mary disposition. We affirm.

The material facts of this case are undisputed. Dur-
ing the late 1920s, the Oakland County drain commis-
sioner constructed a combined storm water and sani-
tary sewer system in an area of the county that was
primarily vacant. Today, those sewers (hereafter
referred to as the Bloomfield Village System) serve

residents and commercial establishments in portions of the city of Birmingham, the city of Bloomfield Hills, and the defendant Bloomfield Charter Township. The Bloomfield Village System carries storm water and untreated sanitary sewage into the Evergreen Farmington Sewage Disposal System (EFSDS), a facility operated by the Oakland County drain commissioner. From there, the untreated wastewater flows on to a treatment plant in the city of Detroit. Because of physical limitations of the EFSDS, the amount of wastewater defendant is permitted to discharge into the EFSDS at any given time is controlled by flow regulators within defendant's sewers. Other municipalities served by the EFSDS are subject to similar limitations.

During periods of heavy precipitation, the amount of wastewater in the Bloomfield Village System occasionally exceeds that which may be discharged into the EFSDS. When this happens, untreated sewage must be diverted elsewhere in order to prevent it from backing up into houses. This event, known as a combined sewer overflow (CSO), is a common problem associated with combined sewer systems. CSOs do not occur in separate (two-pipe) storm water and sanitary sewer systems because in two-pipe systems storm runoff does not mix with sanitary sewage. Until recently, CSOs occurring in the Bloomfield Village System were diverted directly into the Rouge River.

The Clean Water Act, 33 USC 1251 *et seq.*, was passed by Congress in part to address the problems caused by CSOs. Pursuant to the National Pollutant Discharge Elimination System (NPDES) permit program established under that act, the Oakland County drain commissioner and the municipalities served by the

Bloomfield Village System were required to take steps to abate the pollution of the Rouge River. In order to comply with the requirements of federal law—and in particular with a NPDES permit issued on October 12, 1992—the municipalities agreed to construct the ten-million-gallon Lincoln Hills CSO Retention Treatment Basin (RTB).[1] The RTB now serves as a repository for the excess wastewater that would otherwise have been diverted into the Rouge River. Wastewater diverted into the RTB is either held there until the flow rate decreases (at which time it is conveyed to the EFSDS), or treated and released into the river. The result is a cleaner Rouge River.

Construction of the RTB was financed by the drain commissioner through the sale of bonds. Each of the three municipalities using the RTB is responsible for paying its allocated share of the total cost of the project over a period of years. In order to raise money to pay its share, defendant created a special assessment district and adopted a special assessment roll in the amount of $8,887,016.[2] See MCL 280.490; MSA 11.1490. The special assessment district, which includes over two thousand residences, commercial establishments, and the Oakland Hills Country Club, is comprised of all of the parcels within the defendant township served by the Bloomfield Village System. Defendant levied rates ranging from $35 a year to $350 a year on each parcel within the district for a

---

[1] Specifically, the 1992 NPDES permit authorized the affected municipalities' plan to correct the CSO problem through the construction of the RTB. As an alternative, the affected municipalities could have elected to correct the CSO problem by replacing the combined sewers in the Bloomfield Village System with a new two-pipe sewer system utilizing separate lines for storm water and sanitary sewage.

[2] A portion of defendant's share was also paid for by a federal grant.

period of twenty years.[3] All of the parcels inside the township but outside the boundaries of the special assessment district are served either by (1) a two-pipe sewer system, or (2) private septic systems. Accordingly, before construction of the RTB, the only sanitary sewage from the defendant township diverted into the Rouge River was that from those properties within the special assessment district.

Plaintiffs are a group of property owners residing within the special assessment district. In 1994, they brought a class action in the Oakland Circuit Court challenging the creation of the special assessment district. Although the class was never certified, the parties stipulated that defendant would adhere to the result of the action with respect to all of the property owners within the special assessment district. Defendant removed the case to federal court and moved for summary judgment. A federal district court granted defendant's motion for summary judgment, but its opinion was vacated by the Sixth Circuit Court of Appeals on the ground that the district court lacked removal jurisdiction. When the case was eventually remanded back to the Oakland Circuit Court, defendant moved for summary disposition pursuant to MCR 2.116(C)(10). The circuit court granted defendant's motion and plaintiffs brought this appeal.

On appeal, plaintiffs challenge the circuit court's decision to grant defendant's motion for summary disposition. We review de novo a trial court's decision regarding a motion for summary disposition. *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d

---

[3] The special assessment district was subdivided into four geographic sections. The rate of assessment within each section is uniform.

201 (1998). Summary disposition may be granted under MCR 2.116(C)(10) when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Quinto v Cross & Peters*, 451 Mich 358, 362; 547 NW2d 314 (1996). Because there is no factual dispute in this case, the question is simply whether defendant was entitled to judgment as a matter of law.

A special assessment is a levy upon property within a particular district. *Kadzban v Grandville*, 442 Mich 495, 500; 502 NW2d 299 (1993). Unlike a tax, which is imposed to raise revenue for general governmental purposes, a special assessment is designed to recover the costs of improvements that confer local and peculiar benefits upon property within a defined area. *Id.* Two requirements must be met in order for a special assessment to be deemed valid: (1) the improvement funded by the special assessment must confer a special benefit upon the assessed properties beyond that provided to the community as a whole, and (2) the amount of special assessment must be reasonably proportionate to the benefits derived from the improvement. See *id.* at 501-502; *Dixon Rd Group v Novi*, 426 Mich 390, 398-403; 395 NW2d 211 (1986). In order for an improvement to be deemed to have conferred a "special benefit," it must cause an increase in the market value of the land specially assessed. *Kadzban, supra* at 501; *Dixon Rd, supra* at 400-401. A determination of increased market value is necessary to determine whether the benefit is proportionate to the cost incurred. *Dixon Rd, supra* at 401. The decisions of municipal officers regarding special assessments are presumed to be valid and " 'generally

should be upheld.' " *Kadzban, supra* at 502, quoting *Dixon Rd, supra* at 403.

Plaintiffs first contend that the special assessments are invalid because the RTB project conferred no special benefit on their property. We disagree. Plaintiffs assert that the only tangible benefit resulting from the RTB is a cleaner Rouge River. This benefit, they reason, has been conferred upon the community as a whole as much as it has upon those owning property within the special assessment district. Although we do not question the soundness of plaintiffs' reasoning, we believe they have overlooked the most direct and particularized benefit they receive from the RTB: it allows them to continue receiving sewer service from defendant. As a result of the change in federal law, defendant could not legally continue to provide sewer service to plaintiffs without first building the RTB or making an equivalent capital improvement. Plaintiffs admit as much in their brief on appeal, stating that "[t]he construction of the [RTB was] necessary for the Township to continue to operate its sewer system."

Despite this fact, plaintiffs contend that the change in federal law and the construction of the RTB had no practical effect on their use and enjoyment of the subject properties. Of course, plaintiffs' contention rests on the assumption that defendant had an affirmative duty to continue providing sewer service to them. Plaintiffs have offered no authority directly in support of this proposition.[4] Moreover, we have found

---

[4] The two trespass-nuisance cases cited by plaintiffs as ostensibly supporting this proposition, *Hadfield v Oakland Co Drain Comm'r*, 430 Mich 139; 422 NW2d 205 (1988) and *McSwain v Redford Twp*, 173 Mich App 492; 434 NW2d 171 (1988), are inapposite. The fact that a municipality electing to provide sewer service may be held liable for the manner in

nothing to support the existence of such a duty. Cf. *Kuriakuz v West Bloomfield Twp*, 196 Mich App 175, 177; 492 NW2d 757 (1992) (finding no duty to construct storm sewers); *McSwain v Redford Twp*, 173 Mich App 492, 499-500; 434 NW2d 171 (1988) (finding no duty to construct sanitary sewers). While the NPDES permit obligated defendant to construct the RTB as a prerequisite to continued sewer service, it did not impose a duty to continue providing service. Accordingly, as a alternative to building the RTB, defendant could have discontinued sewer service to plaintiffs. Although it is highly unlikely that defendant would have elected to take this course of action, we must acknowledge that hypothetical possibility in order to view plaintiffs' claim in the proper perspective.

If defendant sought to provide new sanitary sewers to an area within the township lacking sewer service, it could fund the project through special assessments. See *Kadzban, supra* at 500-501; see also *Shelby Charter Twp v State Boundary Comm*, 425 Mich 50, 80; 387 NW2d 792 (1986) (LEVIN, J., dissenting); *Oakland Co Drain Comm'r v Royal Oak*, 325 Mich 298, 313; 38 NW2d 413 (1949). Historically, this is how defendant has funded the original construction of local sanitary sewers throughout the township.[5] Given the fact that defendant could fund the original installation of a new sewer system through special assessments, we think it would defy logic to prevent defendant from

---

which it does so is irrelevant to the question whether it must continue to do so.

[5] Pursuant to MCL 280.490(1); MSA 11.1490(1), a special assessment imposed under the authority of the Drain Code is not valid if it is "inconsistent with local financing policy for similar drains and sewers." In this case, plaintiffs do not make a concerted argument that the special assessment district at issue was in violation of this requirement.

using special assessments to fund the conversion of a legally defective sewer system into a legally proper sewer system—especially when the alternative would have been to discontinue service. Cf. *O'Rourke v City of Stamford,* 179 Conn 342; 426 A2d 311 (1979) (finding error in trial court ruling that property owners would receive no special benefit from conversion of a functional, private, polluting sewer system to a new, public, nonpolluting system). For the reasons stated, we hold that construction of the RTB conferred a special benefit upon plaintiffs' properties.

Plaintiffs next argue that the special assessments are invalid because the RTB project did not result in an increase in the market value of their property. We disagree. Although it is undisputed that the construction of the RTB caused no discernible change in the market value of the properties within the special assessment district, we are not persuaded that this fact alone rendered the special assessment district invalid.

The essential question is not whether there was any change in market value, but rather whether the market value of the assessed property was increased as a result of the improvement. See *Kadzban, supra* at 501; *Dixon Rd, supra* at 400-401. Common sense dictates that in order to determine whether the market value of an assessed property has been increased *as a result of* an improvement, the relevant comparison is not between the market value of the assessed property *after* the improvement and the market value of the assessed property *before* the improvement, but rather it is between the market value of the assessed property *with* the improvement and the market value of the assessed property *without* the improvement.

The former comparison measures the effect of time, while the latter measures the effect of the improvement. In this case, it is clear that, after the change in federal law, the market value of plaintiffs' properties with the RTB in place was higher than it would have been without the RTB in place. This is so because without the RTB, defendant could not have continued to provide sewer service to plaintiffs. Without such service, the market value of plaintiffs' properties would undoubtedly have been substantially reduced. Because plaintiffs offer no argument to the contrary, we will not upset the presumably valid judgment of defendant's municipal officers with respect to this issue. *Kadzban, supra* at 502, quoting *Dixon Rd, supra* at 403.

Finally, plaintiffs argue that the special assessments are invalid under defendant's township ordinance regarding the determination of rates and charges for use of the township's sanitary sewer system. We disagree.

Bloomfield Township Ordinance No. 454 provides, in part, "The amount of the rates and charges shall be sufficient to provide for debt service and for the expenses of operation, maintenance and replacement of the system as necessary to preserve the same in good repair and working order." The ordinance further provides that "[t]he rates and charges for operation, maintenance and replacement hereby established shall be uniform within the area serviced by the Township of Bloomfield." Plaintiffs assert that defendant is required under Ordinance No. 454 to fund its allocated share of the cost of the RTB through its uniform sewage treatment fees.

The rules of statutory interpretation apply to the interpretation of ordinances. *Gora v Ferndale*, 456 Mich 704, 711; 576 NW2d 141 (1998). If statutory language is clear and unambiguous, further judicial construction is neither necessary nor permitted, and the language must be applied as written. See *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 27; 528 NW2d 681 (1995); *Lorencz v Ford Motor Co*, 439 Mich 370, 376; 483 NW2d 844 (1992). Because the clear and unambiguous language of Ordinance No. 454  addresses only the preservation of defendant's sanitary sewer system, we conclude that it does not apply to the funding of initial capital improvements. We further conclude that the RTB project was a capital improvement rather than a repair. Rather than merely "preserve the [system] in good repair and working order," construction of the RTB enhanced the operation of the system by preventing the release of pollution into the Rouge River. One of the functions of sewer systems is to abate pollution. See *Andrews v Jackson Co*, 43 Mich App 160, 164; 203 NW2d 925 (1972). That the enhancement in function brought about by the RTB was mandated by federal law does not diminish the fact that the RTB was an improvement to the system. Therefore, we hold that Ordinance No. 454 did not require defendant to fund its allocated share of the cost of the RTB through its uniform sewage treatment fees.

Affirmed.